JAMES, Appellant,

v.

BOB ROSS BUICK, INC. et al., Appellees.

[Cite as *James v. Bob Ross Buick, Inc.,* 167 Ohio App.3d 338, 2006-Ohio-2638.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 21305.

Decided May 19, 2006.

Dwight D. Brannon and Andrea G. Ostrowski, for appellant.

Dale A. Stalf, for appellees.

---

WOLFF, Judge.

{¶ 1} Doug James appeals from a judgment of the Montgomery County Court of Common Pleas, which granted summary judgment in favor of Norma Ross, Jenell Ross, Robert Ross Jr., and Bob Ross Buick, Inc. ("BRBI"), on his claims of reverse race discrimination, invasion of privacy, and civil conspiracy, among others.

{¶ 2} Construed in the light most favorable to James, the record reveals the following facts.

{¶ 3} On March 1, 1989, James, a Caucasian, was hired by BRBI as a car salesman at its Mercedes–Benz dealership.[1]   At that time, BRBI was owned by Robert Ross Sr.  Following the death of Robert Ross Sr., in July 1998, supervisory control and decision-making power was assumed by his widow, Norma Ross, and Jenell Ross, their daughter.  Norma Ross became president and CEO of BRBI, Jenell Ross became vice-president and principal dealer, and Robert Ross Jr. was assigned various duties.  The Rosses are African–Americans.

{¶ 4} In 2002, James was named the sales representative of the year.  In October 2002, James submitted a resume for the position of sales manager.  James was not promoted to that position.  Instead, BRBI hired Glen Lane, an African–American.  Effective October 1, 2003, BRBI instituted mandatory performance criteria for salespeople.  None of the Mercedes–Benz salespeople met the criteria during the last quarter of 2003.

{¶ 5} On January 9, 2004, James's employment with BRBI was terminated by Jenell and Norma Ross, based on the recommendation of Tom Downs, BRBI's general manager.

{¶ 6} Between January 13, 2004, and March 2, 2004, 33 form letters were automatically generated by a "customer relationship management" ("CRM") software program that had been used by BRBI in its business operations for many years.  These form letters were addressed to BRBI customers who, prior to James's termination, had been assigned to him during the term of his employment.  According to Ben Swinger, business development manager for BRBI, BRBI's policy was to delete a terminated employee's data file on the day of his termination so that no further letters were be generated in that employee's

---

1.   BRBI has four franchises:  Buick, GMC, Hummer, and Mercedes–Benz.

name. However, these customers were not reassigned to George Radel, the salesperson who was hired to replace James, until March 2, 2004. Swinger stated that this delay, and the resultant generation of letters in James's name, was unintentional.

{¶ 7} Talia Ogle, an administrative assistance for BRBI, signed the letters generated in James's name subsequent to his termination. Ogle stated in her affidavit that she had signed James's name, with his knowledge and approval, on several occasions during his employment. After the letters were sent, James became aware that some of his former clients—including Richard Mount, Jim Goubeaux, and Roy Huff—had received letters from BRBI that purported to be signed by James.

{¶ 8} On January 20, 2005, James filed suit against BRBI and the Rosses (collectively, "BRBI"), setting forth claims of (1) reverse race discrimination, (2) reverse race discrimination in violation of R.C. 4112.99, (3) wrongful discharge in violation of public policy, (4) invasion of privacy (misappropriation of name), (5) forgery in violation of R.C. 2913.31, (6) identity fraud in violation of R.C. 2913.49, (7) civil recovery for criminal acts under R.C. 2307.60, (8) respondeat superior liability, and (9) civil conspiracy. On July 13, 2005, James sought summary judgment on his civil conspiracy and misappropriation-of-name claims. On the same day, BRBI filed a motion for summary judgment on all of James's claims. James subsequently voluntarily dismissed his claims of forgery, identity fraud, and civil recovery for criminal acts. On September 8, 2005, James filed the deposition of Terry Lowry, a former sales manager for BRBI, and a motion to compel his deposition testimony regarding a settlement between him and BRBI. Later that day, the trial court granted BRBI's motion for summary judgment.

{¶ 9} James raises two assignments of error on appeal.

I. The trial court erred by denying appellant's motion for summary judgment and granting defendants' motion for summary judgment.

{¶ 10} In his first assignment of error, James claims that the trial court erred in granting summary judgment against him on his claims of invasion of privacy, civil conspiracy, and reverse race discrimination.

{¶ 11} Our review of the trial court's decision to grant summary judgment is de novo. See *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reason-able minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See *State ex rel.*

*Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 65–66, 8 O.O.3d 73, 375 N.E.2d 46.

A. *Invasion of Privacy*

{¶ 12} The tort of invasion of privacy includes four separate torts: " '(1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness.' " *Scroggins v. Bill Furst Florist & Greenhouse, Inc.,* Montgomery App. No. 19519, 2004-Ohio-79, 2004 WL 41716, ¶ 32–33, quoting *Killilea v. Sears, Roebuck & Co.* (1985), 27 Ohio App.3d 163, 166, 27 OBR 196, 499 N.E.2d 1291.

{¶ 13} "The forgery of the signature of another is a recognized variant of the tort known generally as invasion of privacy. See Illustration 5, Restatement of the Law 2d, Torts (1965), Section 652C. More specifically, forgery amounts to the appropriation of the name or likeness of another. Id. Ohio has adopted the tort of misappropriation of the name or likeness of another as propounded by the Restatement. *Zacchini v. Scripps–Howard Broadcasting Co.* (1976), 47 Ohio St.2d 224 [1 O.O.3d 129, 351 N.E.2d 454]." [2] *Thomas v. Mitchell* (Dec. 17, 1993), Huron App. No. H–93–17, 1993 WL 553599.

{¶ 14} In granting summary judgment to BRBI on James's misappropriation claim, the trial court noted that BRBI "readily admit[s] that subsequent to Plaintiff's termination, several letters went out to prospective clients of Bob Ross Buick, Inc. that were purportedly signed by Plaintiff, Doug James." The court found that the letters sent by Ogle "were unsanctioned and could have benefitted Bob Ross Buick, Inc." It further concluded that the evidence established that the letters were sent after James's termination and that James had not consented to the use of his name beyond his termination. Although the court found no genuine issue of material fact that BRBI had misappropriated James's name, the court granted summary judgment in BRBI's favor on the ground that James had not presented any proof of damages.

{¶ 15} On appeal, James claims that the trial court erred when it implicitly concluded that damages are an element of the tort of misappropriation of name or likeness. James argues that once the trial court concluded that no genuine issue

---

2.  The Ohio legislature has also codified the right of publicity in an individual's persona, which includes the individual's name, voice, signature, photograph, image, likeness, or distinctive appearance, if any of these aspects have commercial value. R.C. Chapter 2741. R.C. 2741.08 makes clear, however, that this statutory cause of action did not supplant the common-law claim.

of fact existed that BRBI had misappropriated his name, a jury should have determined what damages to award to him. James asserts that at a minimum, he should have been permitted to seek nominal damages, which would have subjected BRBI to punitive damages for their willful and wanton behavior.

{¶ 16} In response, BRBI asserts that its conduct did not rise to the level of an actionable intrusion on James's privacy. Citing *Zacchini*, BRBI notes that the Supreme Court has observed that the "mere mention" of an individual's name is insufficient to constitute an invasion of privacy. BRBI argues that the use of James's name was an innocent mistake which involved only the "mere mention" of his name.

{¶ 17} BRBI's argument is unpersuasive. As noted by BRBI, the Supreme Court has distinguished "the mere incidental use of a person's name and likeness, which is not actionable, from appropriation of the benefits associated with the person's identity, which is." *Zacchini*, 47 Ohio St.2d at 229, 1 O.O.3d 129, 351 N.E.2d 454. The *Zacchini* court cited with approval the Restatement of the Law 2d, Torts (1965), Section 652C, including the portion regarding the incidental use of name or likeness. That portion reads:

{¶ 18} "The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity. No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded."

{¶ 19} In our view, BRBI's conduct cannot reasonably be viewed as the incidental use of James's name. Ms. Ogle and Mr. Swinger both stated in their affidavits that, pursuant to BRBI policy, batches of these form letters were printed out on a daily basis and given to the salespeople to sign and mail to their assigned customers to maintain a relationship with them. James's name was signed to correspondence that was sent to his former clients at BRBI. In this context, his name clearly had a commercial value, as personal letters are used to induce future sales to customers who have established a client relationship with the dealership. Swinger's statement that the letters were inadvertently generated and his opinion that the letters would only serve to confuse clients does not negate the commercial value of James's name with respect to BRBI's customers.

{¶ 20} Moreover, we agree with the trial court's conclusion that the evidence established that the letters were sent after James's termination and that James

had not consented to the use of his name beyond his termination. Although Ogle stated that she signed the letters "inadvertently," we agree with the court's conclusion that there was no genuine issue of material fact that BRBI had misappropriated James's name.

{¶ 21} James argues on appeal that having correctly concluded that BRBI had misappropriated his name, the trial court should allowed the question of damages to be tried to a jury. As noted by the trial court, there is a paucity of precedent in Ohio regarding the application of this tort. In *Schlessman v. Schlessman* (1975), 50 Ohio App.2d 179, 4 O.O.3d 143, 361 N.E.2d 1347, which was cited by the trial court, the Sixth District held that the aggrieved individual had a viable cause of action for misappropriation of his name or image even if the determination of damages was difficult. The *Schlessman* court adopted the reasoning of the Supreme Court of Oregon, which concluded that a plaintiff was entitled to recover nominal damages and any additional damages for injury to his feelings that he may be able to prove, plus punitive damages if there was actual malice. *Schlessman*, 50 Ohio App.2d at 182, 4 O.O.3d 143, 361 N.E.2d 1347, citing *Hinish v. Meier & Frank Co.* (1941), 166 Or. 482, 113 P.2d 438.

{¶ 22} Other jurisdictions have likewise agreed that nominal damages are available for the misappropriation of a person's name or likeness. See, e.g., *Petty v. Chrysler* (2003), 343 Ill.App.3d 815, 826, 278 Ill.Dec. 714, 799 N.E.2d 432 ("A claimant alleging misappropriation of identity need not prove actual damages, because the court will presume damages if someone infringes another's right to control his identity"); accord *Town & Country Properties, Inc. v. Riggins* (1995), 249 Va. 387, 457 S.E.2d 356; *Haith v. Model Cities Health Corp. of Kansas City* (Mo.App.1986), 704 S.W.2d 684. For example, noting that the appropriation of a plaintiff's image is more properly in the nature of a usurpation of a plaintiff's property rights, Illinois courts have held that "[i]t is proper to vindicate plaintiff's right to the use of his image against this deliberate violation, even if plaintiff cannot prove actual damages." *Ainsworth v. Century Supply Co.* (1998), 295 Ill.App.3d 644, 649–650, 230 Ill.Dec. 381, 693 N.E.2d 510.

{¶ 23} We find these cases to be persuasive. We therefore conclude that a plaintiff may seek to recover nominal damages for claims of misappropriation of the plaintiff's name or likeness. See *Rohrbaugh v. Wal–Mart Stores, Inc.* (2002), 212 W.Va. 358, 572 S.E.2d 881. Accordingly, we agree with James that a plaintiff need not establish actual damages in order to prevail on a misappropriation-of-name claim. The trial court thus erred when it granted summary judgment on James's misappropriation claim.

{¶ 24} Furthermore, in our view, the trial court erred when it concluded that BRBI was entitled to summary judgment on actual damages. In order to

foreclose an award of actual damages, BRBI was required to demonstrate in its summary judgment motion that no actual damages were suffered. James stated in his deposition that he felt humiliated and embarrassed by BRBI's use of his name after he had been terminated. Moreover, the trial court concluded that the letters "could have benefitted Bob Ross Buick, Inc." The monetary benefit that BRBI received as a result of its wrongful use of James's name is an appropriate (although not exclusive) measure of James's actual damages. Accord R.C. 2741.07(A)(1)(a). Swinger's opinion that the mailing of the letters "would only serve to confuse the BRBI customer to whom they were addressed" does not refute the possibility that BRBI could have benefited from the use of James's name. Accordingly, upon remand, James may seek nominal, compensatory, and, if appropriate, punitive damages at trial.[3]

## B.  *Civil Conspiracy*

{¶ 25} To establish a claim of civil conspiracy, a plaintiff must prove (1) a malicious combination (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself. *Werthmann v. DONet, Inc.*, Montgomery App. No. 20814, 2005-Ohio-3185, 2005 WL 1490372, ¶ 93. "The malice portion of the tort is 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'" *Gibson v. City Yellow Cab Co.* (Feb. 14, 2001), Summit App. No. 20167, 2001 WL 123467, quoting *Gosden v. Louis* (1996), 116 Ohio App.3d 195, 219, 687 N.E.2d 481. To recover for civil conspiracy, the plaintiff must suffer actual damages. *Reno v. Centerville,* Montgomery App. No. 20078, 2004-Ohio-781, 2004 WL 316512, ¶ 33; see *Danis v. Great Am. Ins. Co.*, 159 Ohio App.3d 119, 133, 2004-Ohio-6222, 823 N.E.2d 59.

{¶ 26} Reviewing James's claim, the trial court found that James had not brought forth evidence of a malicious combination between two or more persons. The court cited Ogle's affidavit that she had signed the form letters based on her prior habits and practices and that she was not asked by anyone at BRBI to sign the letters. The court further concluded that "nothing malicious has been shown."

{¶ 27} James claims on appeal that the trial court failed to consider the deposition testimony of Jenell Ross in concluding that no malicious combination of

---

3.  James asserts that an award of nominal damages will subject BRBI to punitive damages for its willful and wanton behavior. However, the issue of whether nominal damages may be a basis for punitive damages under the relevant version of R.C. 2315.21 has not been briefed. Accordingly, we state no opinion as to whether, upon remand, James may seek punitive damages should he be awarded only nominal damages. Compare R.C. 2741.07 (setting forth available damages for violation of R.C. 2741.02).

two or more persons existed. He further asserts that he has established the underlying tort of misappropriation of his name and that he suffered embarrassment and humiliation as a result of BRBI's actions.

{¶ 28} We agree with the trial court that James's civil conspiracy claim fails for want of evidence of a malicious combination involving two or more persons. As stated by the trial court, Ogle indicated in her affidavit that she was not asked by anyone at BRBI to sign James's name to the letters at issue and that she signed and apparently mailed the letters based on her prior habits and practices. Jenell Ross's deposition testimony does not contradict this. Jenell testified that Ogle had told her that Ogle had been instructed by BRBI management, specifically Paul Forrest, to sign letters for a salesperson in the event that the individual did not comply with getting the letters signed. Jenell further stated that it was not the company's intent or direction to have James's letters signed and mailed after his employment had been terminated.

{¶ 29} Based on the record, there is no evidence that the signing and mailing of letters to James's clients after his termination was the result of a conspiracy between Ogle and any other individuals at BRBI. Accordingly, the trial court properly granted summary judgment to BRBI on the civil conspiracy claim.

## C. *Reverse Race Discrimination*

{¶ 30} A claim of reverse race discrimination may be proven by either direct or circumstantial evidence. See, e.g., *Byrnes v. LCI Communication Holdings Co.* (1996), 77 Ohio St.3d 125, 128, 672 N.E.2d 145. Because of the difficulty of proving a discrimination claim, the Supreme Court of Ohio has adopted the analytical framework set forth in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 6 OBR 202, 451 N.E.2d 807; *Williams v. Akron,* 107 Ohio St.3d 203, 2005-Ohio-6268, 837 N.E.2d 1169. To establish a reverse-race-discrimination claim based upon circumstantial evidence, a plaintiff must first show a prima facie case of discrimination. *Coryell v. Bank One Trust Co. N.A.,* 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781. Once this prima facie case is established, an inference of discrimination arises. The burden then shifts to the employer to show that it had a legitimate, nondiscriminatory reason for its action. See *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 503, 575 N.E.2d 439. If the employer articulates such a reason, the presumption created by the prima facie case "drops from the case because the employer's evidence has rebutted the presumption of discrimination." *Williams,* 107 Ohio St.3d 203, 2005-Ohio-6268, 837 N.E.2d 1169, ¶ 12. The employee must then show that the articulated reason was merely a pretext for discrimination. See id. The burden of persuasion, however, always remains with the plaintiff. *St. Mary's Honor Ctr. v. Hicks*

(1993), 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407. In evaluating discrimination claims, it is appropriate to look to analogous federal antidiscrimination statutes. See *Plumbers Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.* (1981), 66 Ohio St.2d 192, 20 O.O.3d 200, 421 N.E.2d 128; *Wooten v. Columbus Div. of Water* (1993), 91 Ohio App.3d 326, 334, 632 N.E.2d 605.

{¶ 31} In the trial court, James asserted that there was direct evidence that BRBI terminated him in order to replace him with an African–American employee. The court found no direct evidence of discrimination, and James has not challenged that conclusion on appeal. As for James's indirect case of reverse race discrimination, the trial court found that James had not presented evidence to support a prima facie case of discrimination, nor had he come forward with evidence that BRBI's proffered reason for his termination was pretextual. James challenges both aspects of the trial court's ruling on his circumstantial case.

{¶ 32} To establish a prima facie case of race discrimination involving the termination of employment, an employee ordinarily must show (1) that he is a member of a protected class, (2) that he was qualified for the position at issue, (3) that he suffered an adverse employment action such as nonpromotion or termination, and (4) that he was replaced by someone outside the protected class. *Smith v. Goodwill Indus. of Miami Valley, Inc.* (1998), 130 Ohio App.3d 437, 441–442, 720 N.E.2d 203. Alternatively, the fourth element may be satisfied with evidence that a comparable nonprotected person was treated better. Id. at 443, 720 N.E.2d 203. In cases involving reverse race discrimination, some courts have altered the first element of the prima facie case by requiring a white plaintiff to demonstrate "background circumstances supporting the inference that [the employer] was the unusual employer who discriminated against [the majority]." *Mowery v. Columbus,* Franklin App. No. 05AP–266, 2006-Ohio-1153, 2006 WL 620902, ¶ 44; *Grooms v. Supporting Council of Preventative Effort,* 157 Ohio App.3d 55, 62–64, 2004-Ohio-2034, 809 N.E.2d 42.

{¶ 33} The trial court concluded that James had not offered any evidence that would support an inference that BRBI was the unusual employer that discriminated against the majority. The court further concluded that James did not present evidence that he was replaced by a minority. The court found that the second and third elements—that James was qualified for his position and had suffered an adverse employment action—were satisfied.

{¶ 34} James asserts that the trial court erred in concluding that he had failed to establish a prima facie case of discrimination for two reasons. First, James argues that BRBI did not satisfy its initial burden of establishing the

absence of a genuine issue of material fact as to the elements of his prima facie claim, in accordance with *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264. In other words, James contends that BRBI never met its initial burden of demonstrating an absence of evidence, which was necessary to shift the burden to him to support his claim. Alternatively, James claims that he could satisfy each element of his prima facie case.

{¶ 35} The bases for BRBI's motion for summary judgment on James's race-discrimination claim were expressed in a single paragraph, as follows:

{¶ 36} "Contrary to Plaintiff's naked allegations of reverse race discrimination, the undisputed evidence of record herein is that Plaintiff's employment was not terminated by BRBI due to his race or the color of his skin. He was fired on account of his repeated and flagrant violations of BRBI policies, his lack of production as a salesman and an attitude that was poisoning the workplace and had caused a very real and recent problem with Mercedes–Benz, one of BRBI's most valuable clients. The fact that BRBI is owned by two African–American females means nothing. It is, of course, absolutely fatal to Plaintiff's claims that he was fired by a Caucasian male at a meeting attended by all Caucasians, and that he was replaced by—no real surprise here—a Caucasian male. For all these reasons, Plaintiff's claims are patently frivolous and must be dismissed forthwith."

{¶ 37} In setting forth the facts related to James's termination, BRBI referred the court to Downs's affidavit, which was attached to its motion, "for further details about Plaintiff's termination." Downs's affidavit indicated that the decision to terminate James was made by Downs and that BRBI later hired George Radel, a Caucasian male, to fill James's position.

{¶ 38} We agree with James that BRBI's motion did not place at issue every element of his prima facie case. However, by arguing that Downs made the decision to terminate James's employment and that James was replaced by a Caucasian, with references to Downs's affidavit to support those assertions, BRBI placed at issue whether James could satisfy the fourth element of his prima facie case.

{¶ 39} James argues that there is a genuine issue of material fact regarding who replaced him. James notes that there were two openings for Mercedes–Benz salespeople in January 2004 due to his termination and the firing of another employee, Kelly Kirkendall. In his deposition, James testified that he "was under the impression that [BRBI] brought in a black gentleman from Atlanta" to replace him. James further testified that a Caucasian man named George had also been hired. Upon further questioning, James stated, "I don't know who replaced who."

{¶ 40} In his affidavit, Downs stated that BRBI hired George Radel, a Caucasian male, to fill James's position. In her deposition, Jenell Ross testified that Radel was hired to replace James and that Melvin Bradley, an African–American, was hired in September or October 2004. BRBI's employee records, attached to James's memorandum in opposition to BRBI's motion for summary judgment, indicate that Radel was hired on February 12, 2004, and that Bradley was hired on September 13, 2004. Jenell indicated that the customers who had been assigned to James in the database were reassigned to Radel. She further indicated that due to Radel's experience, Radel was the only person "to pick up that database and be able to handle the degree of caliber of Doug James' customer base." Swinger stated in his affidavit that he reassigned James's previously assigned customers to Radel on March 2, 2004.

{¶ 41} Upon review of the record, the trial court properly concluded that there was no genuine issue of material fact that James was replaced by George Radel. James's subjective impression that he may have been replaced by Bradley, without evidence to support that belief, is insufficient to create a genuine issue of material fact regarding which individual was hired by BRBI as his replacement. Because James failed to present evidence on the fourth element of his prima facie case, the trial court properly granted summary judgment on his reverse-race-discrimination claim in favor of BRBI.

{¶ 42} In light of James's failure to create an inference of discrimination, we need not address whether the trial court properly concluded that he had failed to come forward with evidence that BRBI's proffered reason for his termination was pretextual.

{¶ 43} The first assignment of error is overruled in part and sustained in part.

II.  The trial court erred when it overruled appellant's motion to compel the deposition testimony of Terry Lowry.

{¶ 44} James's second assignment of error concerns his motion to compel the deposition testimony of Terry Lowry regarding the terms of a settlement agreement between Lowry and BRBI. James indicates that Lowry had filed claims of reverse race discrimination and misappropriation of name after his termination on February 28, 2002. That lawsuit was settled at mediation on February 9, 2004. The terms of the settlement apparently included a confidentiality clause. As a result, Lowry refused to answer questions during his deposition regarding the terms of the settlement.

{¶ 45} On September 8, 2005, James filed a motion to compel Lowry's testimony regarding the settlement, arguing that "[t]he only reason that defense counsel could object to a question or the witness could refuse to answer a question was if it called for privileged information." James asserted that a

subpoena must override any private agreement to keep information confidential. Later that same day, the trial court granted BRBI's motion for summary judgment and overruled James's motion for summary judgment. The motion to compel was not addressed, and we presume that it was overruled. On appeal, James claims that the trial court should have granted his motion.

{¶ 46} In light of our disposition of James's reverse-race-discrimination claim, we need not address the merits of this assignment of error. There is no suggestion that Lowry's testimony regarding his settlement with BRBI would have had any bearing on whether James had been replaced by a minority. Accordingly, James's second assignment of error is overruled as moot.

{¶ 47} The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

Judgment accordingly.

BROGAN and FAIN, JJ., concur.